**UNITED STATES of America**

v.

**Scott YEAGER.**

**Criminal Action No. H–03–0093.**

United States District Court,
S.D. Texas,
Houston Division.

Aug. 30, 2006.

J.A. Tony Canales, Canales & Simonson, Corpus Christi, TX, Lee Leland Hamel, Hamel Bowers et al., Houston, TX, for Scott Yeager (6).

### *AMENDED ORDER* *

GILMORE, District Judge.

Pending before the Court is Defendant Scott Yeager's Motion to Dismiss Counts 27 through 46 and 67 through 165 on Fifth–Amendment Collateral–Estoppel

* This Order was amended to correct minor citation and typographical errors prior to publication.

Grounds (**Instrument No. 885**), filed on September 2, 2005. Also pending before the Court is Defendant Yeager's Motion to Dismiss the Eighth Superseding Indictment on Fifth Amendment Collateral–Estoppel Grounds, or in the Alternative, on Statute of Limitations Grounds (**Instrument No. 940**), filed on December 16, 2005.

## I.

On March 11, 2003, the United States of America filed a multiple-count Indictment against Defendants Joseph Hirko, Kevin Howard, Scott Yeager, Rex Shelby, Michael Krautz (hereinafter "Defendants") and former Defendants Kenneth Rice and Kevin Hannon, charging them with conspiracy to commit wire fraud and securities fraud, and substantive counts of wire fraud, securities fraud, insider trading, and money laundering. The government filed a Fourth Superseding Indictment on July 22, 2004. (Instrument No. 340). On November 5, 2004, the government filed a Fifth Superseding Indictment. (Instrument No. 468). During the relevant times in the Indictment, Defendants served in various positions as executives to Enron Communications, Inc., later renamed to Enron Broadband Services ("EBS").

In the Fifth Superseding Indictment, Count One charged Defendant Yeager with conspiracy to commit securities fraud and wire fraud. (Instrument No. 468). Count Two of the Indictment charged Defendant Yeager with the substantive offense of securities fraud in connection with allegedly false statements and material omissions at a January 20, 2000 Analyst Conference. (*Id.*). Counts Three through Six charged Defendant Yeager with the substantive offense of wire fraud in connection with press releases issued by Enron Broadband Services on January 31, 2000 through May 15, 2000. (*Id.*). Counts Twenty–Seven through Forty–Six charged Defendant Yeager with insider trading based on trades of Enron stock made on January 21, 2000 through August 23, 2000. (*Id.*). Counts Sixty–Seven through One Hundred Sixty–Five charged Defendant Yeager with money laundering based on transactions on February 7, 2000 through September 18, 2001. (*Id.*).[1]

On April 18, 2005, through July 13, 2005, this Court conducted a jury trial on all of the charges pending against the Defendants. On July 20, 2005, the jury returned a verdict of not guilty against Defendant Scott Yeager on conspiracy to commit wire fraud and securities fraud, and the substantive counts of securities fraud and wire fraud. (Instrument No. 869). The jury did not enter a verdict on the insider trading and money laundering counts pending against Defendant Yeager, and indicated that they were hopelessly deadlocked. (*Id.*). On November 9, 2005, the government filed an Eighth Superseding Indictment charging Defendant Yeager with insider trading and money laundering, indicating its intention to retry Defendant Yeager on the insider trading and money laundering counts on which the jury failed to render a verdict. (Instrument No. 912).

The Eighth Superseding Indictment charges Defendant Yeager with several counts of insider trading and money laundering, but removes counts that were subject to acquittal in the prior proceeding. The Eighth Superseding Indictment also

---

1. Each of the Counts against Defendant Yeager incorporated the same factual allegations stated in Paragraphs 1 through 33 of the Indictment. Specifically, each Count stated that "[t]he allegations in paragraphs 1 through 33 ... are realleged as if fully set forth here." The Counts then set forth the specific charges against Defendant Yeager. (*See, e.g.,* Count One, below).

removes certain counts that the government elected not to include in the Eighth Superseding Indictment, and sets forth factual allegations that provide a more detailed description of the inside information that Defendant Yeager allegedly possessed at the time he made trades of Enron stock. A comparison of the counts alleged in the Fifth Superseding Indictment and the Eighth Superseding Indictment is set forth below.

| *United States v. Scott Yeager*<br>(Cr. No. 03–0093–8)<br>Conversion Chart for Counts Relating to Scott Yeager | |
|---|---|
| **5th Superseding Indictment**<br>*United States v. Hirko, et al.*<br>(Cr. No. 03–0093–5) | **8th Superseding Indictment,**<br>*United States v. Scott Yeager*<br>(Cr. No. 03–0093–8) |
| 1<br>(Conspiracy to Commit Securities and Wire Fraud) | N/A |
| 2<br>Securities Fraud: 2000 Analyst Conference | N/A |
| 3<br>(Wire Fraud—1/31/00 Press Release) | N/A |
| 4<br>(Wire Fraud—3/30/00 Press Release) | N/A |
| 5<br>(Wire Fraud—4/11/00 Press Release) | N/A |
| 6<br>(Wire Fraud—5/15/00 Press Release) | N/A |
| 27<br>(Insider Trading—Scott Yeager) | 1 |
| 28<br>(Insider Trading—Scott Yeager) | 2 |
| 29<br>(Insider Trading—Scott Yeager) | 3 |
| 30<br>(Insider Trading—Scott Yeager) | 4 |
| 31<br>(Insider Trading—Scott Yeager) | 5 |
| 32–46<br>(Insider Trading—Scott Yeager) | N/A |
| 67<br>(Money Laundering) | 6 |
| 68<br>(Money Laundering) | 7 |
| 69<br>(Money Laundering) | 8 |
| 70<br>(Money Laundering) | 9 |
| 71<br>(Money Laundering) | 10 |
| 72<br>(Money Laundering) | 11 |
| 73<br>(Money Laundering) | 12 |

*United States v. Scott Yeager*
(Cr. No. 03–0093–8)
Conversion Chart for Counts Relating to Scott Yeager

| 74–80 (Money Laundering) | N/A |
|---|---|
| 81 (Money Laundering) | 13 |
| 82–165 (Money Laundering) | N/A |

*N/A indicates that a particular count was either the subject of an acquittal in the prior proceeding or the government has elected not to include it in the 8th Superseding Indictment.

On September 2, 2005, Defendant Yeager filed a Motion to Dismiss Counts 27 through 46 and 67 through 165 on Fifth–Amendment Collateral–Estoppel Grounds (Instrument No. 885). Under the Double Jeopardy Clause of the Fifth Amendment and Doctrine of Collateral Estoppel, Defendant Yeager moves to dismiss Counts 27 through 46 (insider trading) and Counts 67 through 165 (money laundering) of the Fifth Superseding Indictment, arguing that the crimes charged in those counts were effectively litigated and decided against the government at the first trial. (Instrument No. 885). In support of his Motion to Dismiss Counts 27 through 46 and Counts 67 through 165 of the Fifth Superseding Indictment, Defendant Yeager argues that "[t]he grand jury incorporated paragraphs 1–33 as the sole description of the scheme in each charged offense: conspiracy, securities fraud at the 2000 Analyst Conference, wire fraud relating to allegedly false press releases, insider trading, and money laundering." (Instrument No. 885, at 1). Thus, Defendant Yeager argues that "[b]y acquitting him on Counts One to Six of the Indictment, the jury rejected Yeager's participation in the scheme described in Paragraphs 11 to 33," which also include the only grounds for the alleged insider trading counts. (*Id.* at 2). As such, Defendant Yeager argues that retrial on the insider trading counts and dependent money laundering counts are prohibited by the Fifth Amendment on collateral estoppel grounds.

In the alternative, Defendant Yeager seeks a suppression order prohibiting the government "from revisiting the factual issues decided by the first jury verdict ... that (1) Yeager did not make, conspire to make, or aid and abet false statements at the 2000 Analyst Conference, (2) Yeager did not participate in a conspiracy with the other defendants, (3) Yeager did not make, conspire to make, or aid and abet false statements in the press releases charged in Counts Three through Six, and (4) Yeager did not participate in the scheme to defraud described in Paragraphs 1 to 33 of the Indictment." (*Id.* at 19–20). On the basis of collateral estoppel, Defendant Yeager further seeks to prohibit the introduction of evidence related in any way to the counts upon which the jury returned verdicts of not guilty (Counts 1–6), including evidence relating to the press releases and 2000 Analyst Conference. (*Id.* at 25).

On December 16, 2005, Defendant Yeager filed a Motion to Dismiss the Eighth Superseding Indictment on Fifth Amendment Collateral–Estoppel Grounds, or in the Alternative, on Statute–of–Limitations Grounds. (Instrument No. 940). Defendant Yeager's Motion to Dismiss the Eighth Superseding Indictment On Collat-

eral–Estoppel Grounds is basically a reiteration of Yeager's original Motion to Dismiss the Fifth Superseding Indictment on Collateral–Estoppel Grounds. Both motions present substantially similar arguments, thus the Court will address the Motion to Dismiss the Eighth Superseding Indictment after resolving the issues presented by Yeager's original Motion to Dismiss the Fifth Superseding Indictment. In the alternative, Defendant Yeager argues that the new insider trading charges in the Eighth Superseding Indictment broaden or substantially amend the charges in the Fifth Superseding Indictment, and that the new charges are barred by the statute of limitations. (Instrument No. 940, at 18). The Court also addresses these issues separately.

## II.

█ The Supreme Court has stated that the principle of collateral estoppel in criminal cases is embodied in the Fifth Amendment's proscription against double jeopardy. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. 1189. According to the Supreme Court

> [T]he rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of the prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter, and conclude whether a rational jury could have grounded its verdict

upon an issue other than that which the defendant seeks to foreclose from consideration. The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.

*Id.* at 443–44, 90 S.Ct. 1189 (internal citations and quotations omitted).

█ In the Fifth Circuit, collateral estoppel may affect successive criminal prosecutions in one of two ways. First, "it will completely bar a subsequent prosecution if one of the facts necessarily determined in the former trial is an essential element of the subsequent prosecution." *United States v. Brackett,* 113 F.3d 1396, 1398 (5th Cir.1997). Second, "while the subsequent prosecution may proceed, collateral estoppel will bar the introduction or argumentation of facts necessarily decided in the prior proceeding." *Id.* (citing *United States v. Deerman,* 837 F.2d 684, 690 (5th Cir.1988)). "Facts so established in the first trial may not be used in the second trial either as ultimate or as evidentiary facts." *United States v. Mock,* 604 F.2d 341, 343 (5th Cir.1979).

█ It is axiomatic that "collateral estoppel bars relitigation only of those facts necessarily determined in the first trial." *Brackett,* 113 F.3d at 1398 (quoting *Deerman,* 837 F.2d at 690). "When a fact is not necessarily determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue." *Id.* at 1398–99 (quoting *United States v. Lee,* 622 F.2d 787, 790 (5th Cir. 1980) (emphasis in original)). Thus, "the first step in resolving a claim of collateral estoppel is to determine which facts were 'necessarily decided' in the first trial." *Id.* (citing *United States v. Levy,* 803 F.2d 1390, 1398–99 (5th Cir.1986); *Mock,* 604 F.2d at 343). "At this first stage of the inquiry, the defendant bears the burden of

demonstrating that the issue he seeks to foreclose was 'necessarily decided' in the first trial." *Id.* (citing *Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)).

■ In a criminal case, the determination of what the jury necessarily decided can be an "awkward" task, because "a general verdict of acquittal does not specify the facts 'necessarily decided' by the jury." *Id.* at 1399. Thus, in making the determination of what the jury necessarily decided, the court "must examine allegations of the indictment, testimony, court's instructions to the jury, and jury's verdict to consider what makes the jury's verdict coherent." *Deerman,* 837 F.2d at 690. This inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189 (quoting *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948)). "Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Id.*

With these principles in mind, the Court first turns to the question of whether the government is completely barred from prosecuting Defendant Yeager on the charges contained in Counts 27 through 46 and 67 through 165 of the Fifth Superseding Indictment. Then, the Court will determine whether the government should be prohibited from offering evidence related to the counts upon which Defendant Yeager was found not guilty in the first trial.

### III.

■ In this case, the Fifth Superseding Indictment charged Defendant Yeager and others with conspiracy to commit wire fraud and securities fraud (Count 1); securities fraud in connection with the 2000 Analyst Conference (Count 2); and wire fraud relating to press releases (Counts 3–6). The Indictment further charged Defendant Yeager individually for insider trading (Counts 27–46) and money laundering (Counts 67–165). (Instrument No. 468) (*See* chart above). After a 3–month trial by jury, the jury entered a verdict of "not guilty" on the conspiracy, securities fraud, and wire fraud counts against Defendant Yeager. The jury indicated that they were hopelessly deadlocked on the insider trading and money laundering counts against Defendant Yeager. The Court entered a mistrial on the deadlocked insider trading and money laundering counts, at the request of defense counsel.

Defendant Yeager contends that the government should be barred from prosecuting him on the insider trading and money laundering counts because (1) the acquitted conspiracy, securities fraud and wire fraud counts allege the same factual allegations that underpin the insider trading counts, and (2) the evidence presented at trial on the acquitted counts pertaining to alleged false statements and omissions made at the 2000 Analyst Conference and in press releases, is the very same evidence the government submitted on the insider trading counts. With regard to the insider trading counts, Defendant Yeager specifically argues that "[a]t no point did the Government explain what material, nonpublic information Yeager was in possession of except by implication: when he allegedly made statements or omissions at the 2000 Analyst Conference and in press releases, Yeager knew that those statements were false, and that knowledge constituted material, nonpublic information that he was not permitted to trade on." (Instrument No. 885, at 12). Defendant Yeager further argues that the money

laundering counts should be dismissed, because the money laundering counts are dependant on Yeager's receipt of proceeds from the insider trading offenses. (*Id.* at 2).

To resolve the issues presented by Defendant Yeager, the Court must review, among other things, the indictment, the jury charge and verdict, the theory of prosecution, the theory of defense, and the evidence presented at trial. The complexity of this determination is underscored by the incestuous nature of the factual allegations contained in the Indictment.

### A.

Paragraphs 1 through 33 of the Fifth Superseding Indictment provide a broad introduction to the Enron Broadband case and alleged schemes to defraud. (Instrument No. 468). Each of the counts of which Defendant Yeager was acquitted (conspiracy, securities fraud, and wire fraud) incorporate Paragraphs 1 through 33 of the Indictment. The remaining insider trading and money laundering counts, on which the jury was deadlocked, also incorporate Paragraphs 1 through 33. Paragraphs 1 through 10 of the Indictment provide a background description of the parties and Enron Broadband Services. The remaining Paragraphs, entitled "THE SCHEMES TO DEFRAUD," provide a summary of the alleged schemes to defraud, including the proposal to build the Enron Intelligent Network, a description of alleged false press releases, alleged false statements at the 2000 Analyst Conference, the Blockbuster Agreement and Project Braveheart transaction, alleged false statements at the January 2001 Analyst Conference, and "The Defendants'

Stock Trading." (Instrument No. 468).[2] Specifically, Paragraph 11 of the Indictment describes the overall summary of the schemes to defraud as follows:

> 11. From at least April 1999 until May 14, 2001, defendants, JOSEPH HIRKO, KEVIN HOWARD, SCOTT YEAGER, REX SHELBY, and MICHAEL KRAUTZ, together with others, engaged in conduct and made false and misleading statements and omitted material information from statements made, all of which were designed to and did deceive the investing public and others about the technological capabilities, value, revenue and business performance of EBS. The defendants executed this scheme by, among other means: (i) causing Enron to issue materially false and misleading press releases; (ii) making and causing others to make materially false and misleading statements to equity analysts and others; (iii) using fraudulent means to generate revenue so that EBS and Enron could appear to reach publicly declared financial targets; and (iv) failing to disclose material adverse information about EBS's poor business performance. During this same time period, defendants HIRKO, YEAGER and SHELBY sold large quantities of Enron stock, generating millions of dollars for themselves.

(Instrument No. 468, at 3–4).

Paragraph 11 describes the overall scheme to defraud alleged in Count One of the Indictment. Count One of the Indictment alleges conspiracy to commit wire

---

**2.** None of the allegations pertaining to the Blockbuster agreement, Braveheart Transaction, and alleged false statements at the January 2001 Analyst Conference are relevant to the charges and evidence against Defendant Yeager. Thus, the Court need not address these allegations in the context of the current Motion.

and securities fraud.[3] Count One also alleges several overt acts in furtherance of the conspiracy. Each of the allegations in the second sentence of Paragraph 11 pertain to the overt acts listed in Count One, and correspond to the alleged schemes to defraud in Counts Two through Twenty-Two of the Indictment. For example, the phrase "issue materially false and misleading press releases" refers to overt act "a." (False Press Release–1999) and overt acts "e." through "h." (False Press Releases–2000), which correspond to Counts 3–6 (Wire Fraud April 1999 to July 2000). The phrase "making and causing others to make materially false and misleading statements to equity analysts" refers to overt acts "b." through "d." (The 2000 Analyst Conference) and overt acts "i." through "j." (The 2001 Analyst Conference), which correspond to Count 2 (Securities Fraud January 2000 Analyst Conference).[4] None of the allegations in the second sentence of Paragraph 11 or the overt acts alleged in Count One directly correspond to the insider trading and money laundering counts against any of the Defendants.

The only allegation in Paragraph 11 that corresponds to the insider trading counts is set forth in the third sentence of Paragraph 11, and provides as follows:

"During this same time period, defendants HIRKO, YEAGER and SHELBY sold large quantities of Enron stock." (Instrument No. 468, at 4). The allegations in the third sentence of Paragraph 11 are separate and apart from the allegations corresponding to the overt acts of Count One, and only provide for a temporal connection with the allegations of conspiracy to commit wire and securities fraud. Thus, according to the allegations of Paragraph 11, which the Court read in its charge to the jury, the insider trading counts are not alleged to be an integral part of the overall conspiracy.

Furthermore, the insider trading counts against Defendant Yeager do not rely upon allegations of false statements and omissions made at the 2000 Analyst Conference

---

**3.** Specifically, Count One of the Indictment alleges as follows:

34. The allegations of paragraphs 1 through 33 are realleged as if fully set forth here.

35. On or about and between at least April 19, 1999 and May 14, 2001, both dates being approximate and inclusive, within the Southern District of Texas and elsewhere, the defendants JOSEPH HIRKO, KEVIN HOWARD, SCOTT YEAGER, REX SHELBY and MICHAEL KRAUTZ, together with Kenneth Rice, Kevin Hannon, and others, did knowingly and intentionally conspire (1) willfully and unlawfully to use and employ manipulative and deceptive devices and contrivances and directly and indirectly (i) to employ devices, schemes and artifices to defraud; (ii) to make untrue statements of material fact and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) to engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connec-

tion with the purchase and sale of Enron stock and by the use of the instruments of communication in interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b), 78ff and Rule 10b–5 of the SEC, Title 17, Code of Federal Regulations, Section 240.10b–5, and (2) to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing such scheme and artifice, to cause interstate wire communications in violation of Title 18, United States Code, Section 1343. (Instrument No. 468, at 13 –14).

**4.** Count 31 of the Fourth Superseding Indictment charged Defendants Kenneth Rice and Kevin Hannon with a separate cause of action for (Securities Fraud: 2001 Analyst Conference). However, the charge dropped out of the Fifth Superseding Indictment when Defendants Rice and Hannon pled guilty.

and in press releases. The title of the insider trading counts does not mention the 2000 Analyst Conference and press releases, and nor does the text of the counts. However, the insider trading counts against Defendant Yeager, entitled "(Insider Trading: SCOTTYEAGER)," do specifically allege that "while in possession of material non-public information regarding the technological capabilities, value, revenue and business performance of Enron Communications, Inc. and Enron Broadband Services, YEAGER sold shares of Enron stock...." (Instrument No. 468, at 22). Thus, although the insider trading counts incorporate the factual allegations of Paragraphs 1 through 33, the fate of the insider trading counts is not necessarily decided by the fate of the conspiracy, wire fraud, and securities fraud counts. In addition, the Eighth Superseding Indictment removes all reference to the conspiracy, securities fraud, and wire fraud counts of the Fifth Superseding Indictment. The Eighth Superseding Indictment does not allege that Yeager participated in a scheme to defraud with any other individual, and only refers to alleged inside information that Defendant Yeager allegedly received personally.

In order to further examine the interplay between the conspiracy, wire fraud, and securities fraud counts on which Defendant Yeager was acquitted, and the insider trading counts, the Court turns to the jury charge and verdict.

**B.**

The jury acquitted Defendant Yeager of Count One conspiracy to commit securities fraud and wire fraud. In order to establish the crime of conspiracy the government needed to prove beyond a reasonable doubt that Defendant Yeager (1) made an agreement to commit the crime of wire or securities fraud; (2) knowingly and willfully joined into the agreement; and (3) one of the conspirators committed at least one overt act. (Jury Charge, at 14).

■ Ordinarily, an acquittal of a conspiracy count will not have a preclusive effect on the trial of a substantive offense. It is settled that a conspiracy to commit a crime is a distinct offense from the commission of the crime. *United States v. Brown*, 7 F.3d 1155, 1162 (5th Cir.1993). "This is so even if commission of the crime is listed as an overt act in the conspiracy count." *United States v. Frazier*, 880 F.2d 878, 884 (6th Cir.1989). Because the first element of a criminal conspiracy is an agreement to violate the law, the jury's verdict of acquittal on Count One could rationally have been based on a finding that Defendant Yeager did not agree to a scheme to commit wire and securities fraud. In such a case, the jury could have acquitted Defendant Yeager without ever considering whether Yeager committed the acts charged in the remaining counts of the Indictment, including the insider trading and money laundering counts, whether those acts were listed as overt acts of the conspiracy or not.

In *United States v. Mock*, 604 F.2d 341 (5th Cir.1979), the Fifth Circuit recognized the problem of applying collateral estoppel to an acquittal of conspiracy. In *Mock* the Fifth Circuit made the following observations:

Generally, it is true that a defendant may be acquitted of conspiracy without collaterally estopping the government from later presenting the evidence necessary to convict him of the substantive crime which was the object of the conspiracy. *See United States v. Ballard*, 586 F.2d 1060 (5th Cir.1978). In addition, since the charges require different elements of proof, double jeopardy would pose no bar to the subsequent prosecution. *See Pinkerton v. United*

*States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Wingate v. Wainwright,* 464 F.2d 209, 214 (5th Cir.1972). *Ashe* teaches, however, that we must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter," 397 U.S. at 444, 90 S.Ct. 1189 (footnote omitted), in order to assess the applicability of collateral estoppel. The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Id.,* quoting *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948). In taking this pragmatic approach, the court in *Sealfon,* while recognizing that conspiracy and the substantive offense are different for double jeopardy purposes, nevertheless held that an acquittal on the charge of conspiracy to defraud the United States prohibited the government from later trying to prove that the defendant committed the substantive offense of defrauding the United States, since "the core of the prosecutor's case was in each case the same...." 332 U.S. at 580, 68 S.Ct. 237.

*Mock,* 604 F.2d 341, 344. Thus, the fact that the jury reached a verdict of acquittal on a conspiracy count, and not the insider trading count at issue, does not end the collateral estoppel analysis without further examination of the evidence in the record. The Court must also examine the evidence presented at trial, and does so below.

▇ In this case, however, the jury not only acquitted Defendant Yeager of the Count One conspiracy to commit wire and securities fraud, but also acquitted Defendant Yeager of the substantive counts of wire fraud and securities fraud. In order to establish the crime of wire fraud the government must prove beyond a reasonable doubt that the defendant (1) knowingly devised or intentionally devised a scheme to defraud; (2) acted with a specific intent to defraud; (3) used or caused another person to use interstate wire communications facilities for the purpose of carrying out the scheme; and (4) that the scheme to defraud employed false material representations. *United States v. Odiodio,* 244 F.3d 398, 402 (5th Cir.2001); (Jury Charge, at 34).

▇ In order to establish the crime of securities fraud, the government must prove beyond a reasonable doubt that (1) in connection with the purchase or sale of securities, the defendant either (i) employed a device, scheme, or artifice to defraud, or (ii) made any untrue statement or material omission of fact, or (iii) engaged in an act of fraud and deceit; and (2) acted willfully, knowingly, and with the intent to defraud; and (3) used, or caused to be used, any means or instrumentality of interstate commerce or of the mails. (Jury Charge, at 26).

▇ The crime of insider trading requires proof beyond a reasonable doubt that (1) in connection with the purchase or sale of securities, the defendant employed a device, scheme, or artifice to defraud; (2) acted willfully, knowingly, and with the intent to defraud; (3) used, or caused to be used, any means or instrumentality of interstate commerce; and (4) used material, nonpublic information in his purchase or sale of Enron stock. *United States v. Smith,* 155 F.3d 1051, 1066 (9th Cir.1998); (Jury Charge, at 41–43). Under 15 U.S.C. § 78j(b) and Rule 10b–5, insider trading constitutes a separate and distinct offense from securities fraud based on "a relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108,

63 L.Ed.2d 348 (1980); *see also United States v. O'Hagan*, 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997).

Each of the crimes of wire fraud, securities fraud, and insider trading requires proof beyond a reasonable doubt that the defendant knowingly devised or employed a scheme or artifice to defraud. However, insider trading does not require proof of a false or misleading statement or omission of material fact, as is required in a charge of wire fraud and was alleged in the securities fraud charges.[5] Conversely, wire fraud and securities fraud do not require proof that the defendant used material, nonpublic information in his purchase or sale of corporate stock. Here, the ultimate issue that Defendant Yeager seeks to foreclose from consideration is evidence that he used material nonpublic information in his sale of Enron stock. *See Wright v. Whitley*, 11 F.3d 542, 546 (5th Cir.1994) (noting that collateral estoppel "only bars relitigation of a previously rejected factual allegation where that fact is an ultimate issue in the subsequent case").

Accordingly, the issue presented by Defendant Yeager ultimately asks the Court to determine whether the jury in the first trial rationally could have acquitted him of the schemes to defraud alleged in the conspiracy, securities fraud, and wire fraud charges without finding that he did not use

material, nonpublic information in his sale of Enron Stock.[6] To resolve this issue, the Court must now turn to a review of the theory of the prosecution, the theory of defense, and the evidence presented at trial.

### C.

This Court conducted an approximately three-month long jury trial on the charges against the Defendants, from April 18, 2005, through July 13, 2005. Over the course of the three-month long trial of the Defendants, the government presented a theory of prosecution that Defendants all participated in a single conspiracy aimed at falsely portraying the technological capabilities, value, revenue, and business performance of Enron Broadband Services. The government argued that the objective of the conspiracy was to increase the price of Enron stock, so that the Defendants could personally enrich themselves through stock sales, salary and performance bonuses. The government first presented evidence of the problems with EBS products and services leading up to the January 2000 Analysts Conference.

Specifically, the government presented evidence of problems with the Media Cast and Media Transport products. The government also presented testimony that the

---

**5.** For the crime of securities fraud, the making of an untrue statement or material omission of fact is ordinarily one of several acts that may satisfy the "scheme to defraud" element of securities fraud. Here, the government specifically alleged that Defendants "made false and misleading statements and omitted material information from statements made." (Instrument No. 468, at ¶ 11).

**6.** The government argues that the ultimate issue in this case is whether Defendant Yeager "possessed" material, nonpublic information. However, the Court's Instructions to the Jury charges as follows: "It is not sufficient that the government proves that the defendant

sold Enron stock while knowingly in possession of the material, nonpublic information. Rather, the government must prove beyond a reasonable doubt that the defendant in fact used that material, nonpublic information in his purchase or sale of Enron stock." Thus, the Court declines to base its analysis on mere "possession" of material nonpublic information. *See O'Hagan*, 521 U.S. at 656, 117 S.Ct. 2199 (holding that "[t]he fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he *uses the information* to purchase or sell securities.") (emphasis added).

Interagent software did not function as network control software, and that the Enron Intelligent Network did not possess much intelligence. The government further presented evidence that the network had significant problems with security, an inability to control routers on the network, and an inability to perform billing and quality of service operations. In addition, the government presented evidence of internal arguments between EBS employees, including Rex Shelby, David Berberian, John Griebling, John Bloomer, Joe Hirko, and Scott Yeager. Finally, the government presented evidence of statements acknowledging some of the problems with EBS technological capabilities in the Applications Conference occurring two weeks prior to the January 2000 Analyst Conference.

As the first component of the scheme to defraud, the government presented press releases in the latter part of 1999, and testimony that the press releases did not comport with the problems facing EBS.[7] The government further presented evidence of statements made at the January 2000 Analyst Conference. The government argued that Defendants made false and misleading statements about the EBS fiber network, proprietary software, and technological capabilities. Specifically, the government pointed to statements claiming EBS had an advanced network control software or BOS software, and argued that each statement was false, misleading, or omitted a material fact. The government further argued that Defendants continued to issue false press releases with the purpose of driving up the stock price. Finally, the government argued that Defendants Hirko, Shelby, and Yeager sold large blocks of Enron stock, in order to take advantage of the rising stock price, which resulted from the overall scheme to defraud the investing public at the 2000 Analyst Conference and in press releases. The government's Response to Defendants' Motions for Bill of Particulars and Severance, filed prior to trial on May 21, 2004, provides an additional view of the government's theory of prosecution:

The indictment here does not allege multiple conspiracies, but rather a single scheme composed of different components all aimed at falsely portraying the commercial performance of Enron Broadband Services ("EBS") and the effectiveness of its products and services to the investing public. The objective of this conspiracy was to increase the price at which Enron Corporation's common stock traded which, in turn, personally enriched the defendants through stock sales, salary and performance bonuses. The defendants accomplished the goals of this conspiracy through several methods. For example, in 1999 and the first half of 2000, the indictment alleges that [Yeager and others] orchestrated a series of false press releases claiming that EBS' "Enron Intelligent Network," or "EIN," possessed a sophisticated network control software layer that provided a number of unique features....Building on this publicity campaign, [Yeager and others] planned and presented a message at Enron's January 20, 2000 analyst conference reinforcing the claims made in the press releases that Enron had developed a unique and unprecedented layer of network control software, which it christened the "Broadband Operating System" or "BOS". ....This pattern of

7. None of the press releases prior to January 2000 are actually charged as substantive offenses in the Fifth Superseding Indictment. However, the Indictment lists the issuance of an April 19, 1999 press release as an overt act of the Count One conspiracy to commit wire and securities fraud charge.

misrepresentation had a direct impact on Enron's stock price, initially driving the stock up dramatically in January 2000 and then contributing to its rapid decline in 2001 after it became apparent to the investing public that EBS was a technical and commercial failure. [Yeager and others] also personally profited from the year-long stock price increase by selling vast quantities of stock.

(Instrument No. 271, at 10–12).

With regard to Defendant Yeager, the government introduced evidence of several emails, indicating that Defendant Yeager received adverse nonpublic information about the capabilities of the Enron Intelligent Network and the business performance of Enron Broadband Services. (*See* GX D1080; D1081; D1085; D1088). Specifically, on November 18, 1999, John Bloomer sent an email to Yeager complaining about problems with product development, and difficulty working with the team under Rex Shelby. (GX D1088). In response, on November 21, 1999, Yeager sent an email to John Griebling and John Bloomer, in which Yeager expressed his frustration with the network, products and software efforts as well as with the people working on those efforts. (GX 3024). Defendant Yeager described an ongoing war between John Bloomer, David Berberian, Rex Shelby, Joe Hirko, and David Griebling. (*Id.*). Within the email Yeager made statements such as "[w]e will call version one of the cast product riding on our backbone the EIN even if the I is not very intelligent ...," "Bloomer must have an operating network so the products are more dependent on the Network than some future definition of EIN ...," and "I think we are very close to success and just a [*sic*] close to failure." The government further presented statements of Yeager at a January 9–11, 2000 ePowered Apps Employee Conference, where Yeager de-

scribed the EIN's intelligence as being "in the first grade."

The government argued that Yeager failed to disclose this inside information about the problems with the EIN and within EBS, at the January 2000 Analyst Conference. The government further argued that the object of Defendant Yeager's alleged participation in the scheme to defraud and failure to disclose the "truth" about EBS at the January 2000 Analyst Conference, culminated in his sale of Enron Stock when the public did not know the "truth" about EBS. The same inside information that Yeager allegedly failed to disclose at the January 2000 Analyst Conference is the same alleged inside information that the government claims Yeager possessed when he made trades of Enron stock. After the January 2000 Analyst Conference, the government introduced evidence that Defendant Yeager attended offsite meetings in February and March 2000, in which EBS employees reported on problems with EBS products, the network, and the EIN. However, the government introduced no evidence that Defendant Yeager played any role in the formation of the press releases underlying the wire fraud counts. The government also failed to make any connection between Defendant Yeager and the Blockbuster Agreement or Project Braveheart transaction.

The theory of the defense, evident in closing argument and the direct testimony of Defendant Yeager, argued that Defendant Yeager did not participate in the crafting of the statements in the press releases; did not participate in the creation of slides or statements presented at the analysts conference; and did not reach an agreement with any other person to make false, misleading, or deceptive statements or material omissions of fact. Defendant Yeager did not deny

knowing about problems at Enron Broadband Services or writing emails discussing the problems with Enron Broadband Services and the Enron Intelligent Network (Instrument No. 774 and 775). Rather, Defendant Yeager presented a "good faith" defense through testimony that he believed in the business plan, believed the network operated properly, applied for a patent, and that he worked hard to make things work. (Trial Tr. 9922–24, 9992–10001). Yeager also testified that he honestly believed in several positive statements of EBS employees concerning media cast, media transport, the network operating center, and the EBS business plan made at the ePowered Apps Conference on January 9–11, 2000. (Trial Tr. 10001–22).Yeager further testified that many of the internal conflicts with the project teams and SWAT teams had been resolved by the ePowered Conference. (Trial Tr.10047–50). Defendant Yeager also presented the defense that he did not *"use"* material, nonpublic information, based on testimony that the trades were made by Yeager or his wife, in the course of normal investing and for purposes of diversification. (Trial Tr. 6256–57; 10174–80).

The focus of Defendant Yeager's testimony is reinforced by the arguments made by his defense counsel at trial. For example, in closing argument, Yeager's counsel argued (1) Yeager was merely present at the 2000 Analyst Conference and did not say anything except to answer one question (Trial Tr. 13365); (2) only a few of the dozens of witnesses who testified in the trial ever mentioned Yeager, and did not identify him as a participant in criminal activity (Trial Tr. 13371); (3) Yeager had "nothing to do" with the press releases and that it was Claudia Johnson who had responsibility for them (Trial Tr. 13384); (4) the government charged Defendants with alleged false statements about the Broadband Operating System in a video made by Shelby that was never actually played at the 2000 Analyst Conference (Trial Tr. 13374–75); (5) cooperation witness Ken Rice never said that he talked with Yeager about doing anything illegal or covering up problems at EBS (Trial Tr. at 13402); and (6) Yeager, in good faith, believed in the EBS business plan and development of products (Trial Tr. 13393–94; 13404).

On several occasions, this Court made the determination that the government presented sufficient evidence to the jury to show that Defendant Yeager participated in the overall scheme to defraud charged in the Fifth Superseding Indictment. This is evidenced by the Court's denial of Defendant Yeager's numerous Rule 29 Motions for Judgment of Acquittal. However, the verdicts of acquittal on the conspiracy, securities fraud, and wire fraud counts show that the jury believed Defendant Yeager's testimony and that of other witnesses testifying in favor of Defendant Yeager on those counts.[8] In light of (1) the massive amount of circumstantial evidence presented by the government, and (2) the direct testimony of De-

---

8. The government argues that the jury could have believed the government's case, but acquitted Defendant Yeager based on erroneous grounds. In *United States v. Leach,* 632 F.2d 1337 (5th Cir. Unit A 1980), the Fifth Circuit recognized that "[t]he right of a jury to acquit for whatever reasons even though the evidence supports a conviction is an important part of the jury trial system guaranteed by the Constitution." *Id.* at 1341 n. 12. The Fifth Circuit further noted, however, that if jury nullification is used as a basis on which the jury resolved an issue in favor of the defendant, the Court would be in effect abolishing the entire doctrine of collateral estoppel. *See Id.* (citation omitted); *see also Ashe,* 397 U.S. at 444 n. 9, 90 S.Ct. 1189. Thus, the Court need not consider the Government's argument that the jury could have acquitted Defendant Yeager based on erroneous grounds.

fendant Yeager that he did not participate in the crafting of the message at the 2000 Analyst Conference, drafting of press releases, or agreement to defraud investors, the jury by choosing Yeager's version of the events, necessarily determined that Yeager did not knowingly and willfully participate in the scheme to defraud described in the conspiracy, securities fraud, and wire fraud counts.

However, Defendant Yeager did not need to participate in an overall scheme to defraud in order for the jury to find that Yeager possessed or used material nonpublic information when he made trades of Enron stock. Defendant Yeager also did not deny proof of his possession of material, nonpublic information, but instead argued that he possessed a good faith belief in the EBS business model, technological capabilities, and positive statements that he and others made at the ePowered Apps Conference. As stated in the Instructions to the Jury, "[s]ince an essential element of the crime charged is intent to defraud, it follows that good faith on the part of a defendant is a complete defense to a charge of securities fraud, because such an honest or 'good faith' belief is inconsistent with a fraudulent intent." (Instrument No. 468, at 32). *See United States v. Paradies*, 98 F.3d 1266, 1285 (11th Cir. 1996); *United States v. Amlani*, 111 F.3d 705, 717 (9th Cir.1997); Kenin F. O'Malley, Jay E. Grenig & Hon. Michael Daly Hawkins, FEDERAL JURY PRACTICE AND INSTRUCTIONS-CRIMINAL § 62.15 (5th ed.2000).

 Good faith operates as a valid and complete defense to both securities fraud and insider trading[9], but does not serve as a defense to the crime of conspiracy or wire fraud. *See id.* If the jury necessarily acquitted Defendant Yeager based on

the "good faith" defense, they would have had to acquit Yeager of insider trading as well. Because the jury did not acquit Defendant Yeager of both securities fraud and insider trading, but instead chose only to acquit Yeager of conspiracy, securities fraud, and wire fraud, the Court finds that the most realistic, rational and practical analysis of the verdicts is that the jury did not acquit Defendant Yeager based on the defense of "good faith." Rather, the Court finds that the jury necessarily determined that Defendant Yeager did not knowingly and wilfully participate or agree to participate in a scheme to defraud in connection with the alleged false statements or material omissions made at the analyst conference and press releases.

As stated previously, Yeager's defense, if believed by the jury, would not negate the government's evidence and contention that Yeager possessed and used material nonpublic information at the time he made trades of Enron stock. Yeager's defense would only establish that Defendant Yeager did not participate in the overall scheme to defraud. Accordingly, the Court finds that Defendant Yeager's acquittal on the conspiracy, securities fraud, and wire fraud counts of the Indictment does not completely bar the government from retrying Defendant Yeager on the charges of insider trading and money laundering.

**IV.**

 In the alternative, Defendant Yeager seeks a suppression order prohibiting the government "from revisiting the factual issues decided by the first jury verdict ... that (1) Yeager did not make, conspire to make, or aid and abet false statements at the 2000 Analyst Confer-

---

**9.** *See* Jury Charge, Instrument No. 854 at 32, 45 (describing applicability of good faith defense to securities fraud, and applying all securities fraud instructions to insider trading).

ence, (2) Yeager did not participate in a conspiracy with the other defendants, (3) Yeager did not make, conspire to make, or aid and abet false statements in the press releases charged in Counts Three through Six, and (4) Yeager did not participate in the scheme to defraud described in Paragraphs 1 to 33 of the Indictment." (Instrument No. 885, at 19–20).

The Fifth Circuit has held that "even when a subsequent prosecution is not completely barred ... collateral estoppel may bar the admission or argumentation of *facts* necessarily decided in the first trial." *Brackett,* 113 F.3d at 1400. The Court finds that the first three issues upon which Yeager seeks a preclusion order have merit. As stated previously, Defendant Yeager vigorously defended that he did not participate or take any part in the making of false statements at the 2000 Analyst Conference, false statements in press releases, or participate in the alleged conspiracy.

The jury's verdict of "not guilty" on all counts specifically dealing with the alleged conspiracy to commit securities fraud and wire fraud, and the substantive offenses of securities fraud and wire fraud clearly indicates that the jury "necessarily decided" that Defendant Yeager did not participate or agree to participate in a scheme to defraud in connection with alleged false statements and material omissions made at the 2000 Analyst Conference or in press releases. Thus, the Court finds that the government is precluded from introducing evidence or testimony that Defendant Yeager (1) made, conspired to make, or aided and abetted false statements at the 2000 Analyst Conference, (2) participated in a conspiracy with the other defendants, or (3) made, conspired to make, or aided and abetted false statements in the press releases charged in Counts Three through Six.

■ The Court's finding that the government is precluded from introducing evidence that Yeager participated in a conspiracy or in wire or securities fraud, as outlined above, does not, however, preclude the presentation of evidence otherwise related to the insider trading counts. In other words, while the Court will limit the introduction of facts that the jury necessarily decided in its acquittal of the conspiracy, securities fraud and wire fraud counts, the doctrine of collateral estoppel does not prohibit the government from presenting relevant evidence which serves as the foundation of the crime charged therein to prove remaining counts, as long as such evidence otherwise comports with the Federal Rules of Evidence.

In *Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990), the Supreme Court held that "an acquittal in a criminal case does not preclude the government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Id.* at 349, 110 S.Ct. 668. Thus, the collateral estoppel doctrine "only bars relitigation of a previously rejected factual allegation where that fact is an ultimate issue in the subsequent case." *Wright v. Whitley,* 11 F.3d 542, 546 (5th Cir.1994). However, "a general verdict of acquittal does not 'necessarily decide' an ultimate issue of fact but merely indicates that the evidence was not sufficient to prove every element of the offense beyond a reasonable doubt." *Brackett,* 113 F.3d at 1401; *see also id.* at 1401 n. 9 (stating that *"Dowling* calls into question the line of cases holding that collateral estoppel may bar the admission or argumentation of facts necessarily decided in the first trial, even if the subsequent prosecution is not completely barred.").

Although the jury in the first trial "necessarily determined" that the government

failed to prove, beyond a reasonable doubt, that Yeager participated or agreed to participate in the scheme to defraud involving alleged false statements and material omissions made at the 2000 Analyst Conference and press releases, the government need not prove that fact beyond a reasonable doubt in the retrial of the insider trading counts, because it is not an ultimate issue. In order to convict Defendant Yeager for the crime of insider trading the government need only prove that (1) in connection with the purchase or sale of securities, the defendant employed a device, scheme, or artifice to defraud; (2) the defendant acted willfully, knowingly, and with the intent to defraud; (3) used, or caused to be used, any means or instrumentality of interstate commerce; and (4) used material, nonpublic information in his purchase or sale of Enron stock. (Jury Charge, at 41–43).

The ultimate issue in this case is the determination of whether Defendant Yeager used material nonpublic information when he traded Enron stock. "The admissibility of evidence relevant to an ultimate issue is governed by Fed.R.Evid. 401, which defines 'relevant evidence' as evidence 'having any tendency to make the existence or any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Brackett*, 113 F.3d at 1402. Evidence that statements were made at the Analyst Conference and in press releases that did not comport with other information known to Defendant Yeager at the time of his trading activity is certainly relevant to the charges of insider trading. Thus, the government should be permitted to show in a retrial that Yeager was aware that public statements were made that did not comport with other internal information he was receiving at the time, because both are relevant to the insider trading charges.

Accordingly, collateral estoppel does not bar the government from offering evidence originally offered in the first trial. The admissibility of that evidence is a purely evidentiary matter based on the relevance of that information.

As such, the government is not precluded from introducing evidence relevant to the insider trading counts or evidence otherwise admissible under the Federal Rules of Evidence, including statements made at the 2000 Analyst Conference, press releases charged in the Fifth Superseding Indictment, and factual allegations in Paragraphs 1–33 of the Fifth Superseding Indictment. However, the government is precluded from introducing evidence or testimony that Defendant Yeager (1) made, conspired to make, or aided and abetted false statements at the 2000 Analyst Conference, (2) participated in a conspiracy with the other defendants, or (3) made, conspired to make, or aided and abetted false statements in the press releases charged in Counts Three through Six.

### V.

For the reasons set forth above, the Court finds that the doctrine of collateral estoppel does not bar the government from prosecuting Defendant Yeager on the insider trading and money laundering charges of the Eighth Superseding Indictment. As previously discussed, the government is precluded from introducing evidence or testimony that Defendant Yeager (1) made, conspired to make, or aided and abetted false statements at the 2000 Analyst Conference, (2) participated in a conspiracy with the other defendants, or (3) made, conspired to make, or aided and abetted false statements in the press releases charged in Counts Three through Six. However, the government may introduce any evidence relevant to the insider

trading and money laundering counts otherwise admissible under the Federal Rules of Evidence.

The Court further finds that the statute of limitations places no bar to a retrial of Defendant Yeager under charges set forth in the Eighth Superseding Indictment. "A superseding indictment filed while the initial indictment is pending is timely unless it broadens or substantially amends the charges made in the original indictment." *United States v. Schmick*, 904 F.2d 936, 940 (5th Cir.1990). "[N]otice is the touchstone in deciding whether a superseding indictment substantially changes the original charges." *Id.* Thus, where "the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against him," and the statute of limitations is tolled. *Id.*

In this case, the Court finds that the Eighth Superseding Indictment does not substantially amend the original indictment so as to render it untimely. The Fifth Superseding Indictment gave Defendant Yeager notice that he was to defend against charges of insider trading and money laundering, as well as conspiracy, securities fraud, and wire fraud. On the insider trading counts, the Fifth Superseding Indictment generally charged Yeager with making trades of Enron Stock "while in possession of material non-public information regarding the technological capabilities, value, revenue and business performance of Enron Communications, Inc. and Enron Broadband Services." (Instrument No. 468). However, although the Eighth Superseding Indictment was amended to comport with the findings of the jury on the conspiracy, wire fraud and securities fraud counts, the Eighth Superseding Indictment neither adds new charges or renders Defendant Yeager sus-ceptible to increased punishment. The factual allegations of the Eighth Superseding Indictment merely provide a more detailed description of the inside information that Defendant Yeager allegedly possessed at the time of his trades of Enron stock, but do not broaden or amend the Indictment so as to violate the statute of limitations. *See Schmick*, 904 F.2d at 941 ("Where the facts alleged have not been changed, although additional underlying details have been alleged, a superseding indictment brought outside the statute of limitations is timely."). Accordingly, Defendant Yeager's Motion to Dismiss the Eighth Superseding indictment on Fifth Amendment Collateral–Estoppel Grounds, or in the Alternative, on Statute–of–Limitations Grounds (Instrument No. 940), is **DENIED.**

## VI.

Defendant Yeager's Motion to Dismiss Counts 27 through 46 and 67 through 165 on Fifth–Amendment Collateral–Estoppel Grounds (**Instrument No. 885**) is **GRANTED in part** and **DENIED in part.** Specifically, Defendant Yeager's Motion to completely bar the government from retrying him of insider trading and money laundering is **DENIED.** Defendant Yeager's Motion to preclude the government from introducing certain evidence at trial is **GRANTED in part** as set forth herein.

Defendant Yeager's Motion to Dismiss the Eighth Superseding indictment on Fifth Amendment Collateral–Estoppel Grounds, or in the Alternative, on Statute–of–Limitations Grounds (**Instrument No. 940**) is **DENIED.**

At a subsequent trial of Yeager, the government is precluded from introducing evidence or testimony that Defendant Yeager (1) made, conspired to make, or aided and abetted false statements at the 2000 Analyst Conference, (2) participated

in a conspiracy with the other defendants, or (3) made, conspired to make, or aided and abetted false statements in the press releases charged in Counts Three through Six. However, the government may introduce any evidence relevant to the insider trading and money laundering counts otherwise admissible under the Federal Rules of Evidence.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this 30th day of August, 2006, at Houston, Texas.