(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## YEAGER *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 08–67.   Argued March 23, 2009—Decided June 18, 2009

A federal indictment charged petitioner Yeager with securities and wire fraud for allegedly misleading the public about the virtues of a fiber-optic telecommunications system offered by his employer, a subsidiary of Enron Corp., and with insider trading for selling his Enron stock while in possession of material, nonpublic information about the new system's performance and value to Enron.  The indictment also charged petitioner with money laundering for conducting various transactions with the proceeds of his stock sales.  The jury acquitted Yeager on the fraud counts but failed to reach a verdict on the insider-trading and money-laundering counts.  After the Government recharged him with some of the insider-trading and money-laundering counts, Yeager moved to dismiss the charges on the ground that the jury, by acquitting him on the fraud counts, had necessarily decided that he did not possess material, nonpublic information about the project's performance and value, and that the issue-preclusion component of the Double Jeopardy Clause therefore barred a second trial for insider trading and money laundering.  The District Court denied the motion, and the Fifth Circuit affirmed, reasoning that the fact that the jury hung on the insider-trading and money-laundering counts—as opposed to acquitting petitioner—cast doubt on whether it had necessarily decided that petitioner did not possess material, nonpublic information.  This inconsistency between the acquittals and the hung counts, the Fifth Circuit concluded, meant that the Government could prosecute petitioner anew for insider trading and money laundering.

*Held:* An apparent inconsistency between a jury's verdict of acquittal on some counts and its failure to return a verdict on other counts does not affect the acquittals' preclusive force under the Double Jeopardy

Clause. Pp. 6–15.

(a) This case is controlled by the reasoning in *Ashe* v. *Swenson*, 397 U. S. 436, where the Court squarely held that the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial. For double jeopardy purposes, the jury's inability to reach a verdict on Yeager's insider-trading and money-laundering counts was a non-event that should be given no weight in the issue-preclusion analysis. To identify what a jury necessarily determined at trial, courts should scrutinize the jury's decisions, not its failures to decide. A jury's verdict of acquittal represents the community's collective judgment regarding all the evidence and arguments presented to it. Even if the verdict is "based upon an egregiously erroneous foundation," *Fong Foo* v. *United States*, 369 U. S. 141, 143, its finality is unassailable, see, *e.g.*, *Arizona* v. *Washington*, 434 U. S. 497, 503. Thus, if the possession of insider information was a critical issue of ultimate fact in all of the charges against Yeager, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element. Pp. 6–12.

(b) Neither *Richardson* v. *United States*, 468 U. S. 317, nor *United States* v. *Powell*, 469 U. S. 57, supports the Government's argument that it can retry Yeager for insider trading or money laundering. *Richardson*'s conclusion that a jury's "failure . . . to reach a verdict is not an event which terminates jeopardy," 468 U. S., at 325, did not open the door to using a hung count to ignore the preclusive effect of a jury's acquittal, but was simply a rejection of the argument— similar to the Government's today—that a mistrial is an event of significance. Also rejected is the contention that an acquittal can never preclude retrial on a hung count because it would impute irrationality to the jury in violation of *Powell*'s rule that issue preclusion is "predicated on the assumption that the jury acted rationally," 469 U. S., at 68. The Court's refusal in *Powell* and in *Dunn* v. *United States*, 284 U. S. 390, to impugn the legitimacy of jury verdicts that, on their face, were logically inconsistent shows, *a fortiori*, that a potentially inconsistent hung count could not command a different result. Pp. 12–14.

(c) The Government has argued that, even if hung counts cannot enter the issue-preclusion analysis, Yeager has failed to show that the jury's acquittals necessarily resolved in his favor an issue of ultimate fact that must be proved to convict him of insider trading and money laundering. Having granted certiorari on the assumption that the Fifth Circuit ruled correctly that the acquittals meant the jury found that Yeager did not have insider information that contradicted what was presented to the public, this Court declines to engage in a

Syllabus

fact-intensive analysis of the voluminous record that is unnecessary to resolve the narrow legal question at issue. If the Court of Appeals chooses, it may revisit its factual analysis in light of the Government's arguments before this Court. Pp. 14–15.

521 F. 3d 367, reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOUTER, GINSBURG, and BREYER, JJ., joined, and in which KENNEDY, J., joined as to Parts I–III and V. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment. SCALIA, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined. ALITO, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–67

F. SCOTT YEAGER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2009]

JUSTICE STEVENS delivered the opinion of the Court.

In *Dunn* v. *United States*, 284 U. S. 390, 393 (1932), the Court, speaking through Justice Holmes, held that a logical inconsistency between a guilty verdict and a verdict of acquittal does not impugn the validity of either verdict. The question presented in this case is whether an apparent inconsistency between a jury's verdict of acquittal on some counts and its failure to return a verdict on other counts affects the preclusive force of the acquittals under the Double Jeopardy Clause of the Fifth Amendment. We hold that it does not.

I

In 1997, Enron Corporation (Enron) acquired a telecommunications business that it expanded and ultimately renamed Enron Broadband Services (EBS). Petitioner F. Scott Yeager served as Senior Vice President of Strategic Development for EBS from October 1, 1998, until his employment was terminated a few months before Enron filed for bankruptcy on December 2, 2001. During his tenure, petitioner played an active role in EBS's attempt to develop a nationwide fiber-optic telecommunications system called the Enron Intelligent Network (EIN).

In the summer of 1999, Enron announced that EBS would become a "'core'" Enron business and a major part of its overall strategy. App. 11. Thereafter, Enron issued press releases touting the advanced capabilities of EIN and claiming that the project was "'lit,'" or operational. *Id.,* at 10. On January 20, 2000, at the company's annual equity analyst conference, petitioner and others allegedly made false and misleading statements about the value and performance of the EIN project. On January 21, 2000, the price of Enron stock rose from $54 to $67. The next day it reached $72. At that point petitioner sold more than 100,000 shares of Enron stock that he had received as part of his compensation. During the next several months petitioner sold an additional 600,000 shares. All told, petitioner's stock sales generated more than $54 million in proceeds and $19 million in personal profit. As for the EIN project, its value turned out to be illusory. The "intelligent" network showcased to the public in the press releases and at the analyst conference was riddled with technological problems and never fully developed.

On November 5, 2004, a grand jury returned a "Fifth Superseding Indictment" charging petitioner with 126 counts of five federal offenses: (1) conspiracy to commit securities and wire fraud; (2) securities fraud; (3) wire fraud; (4) insider trading; and (5) money laundering.[1] The Government's theory of prosecution was that petitioner—acting in concert with other Enron executives—purposefully deceived the public about the EIN project in order to inflate the value of Enron's stock and, ultimately, to enrich himself.[2] *Id.,* at 6.

_____

[1] See 18 U. S. C. §371 (conspiracy to commit fraud against the United States); 15 U. S. C. §78j(b) (1994 ed.), §78ff (2000 ed.), and 17 CFR §240.10b–5 (2004) (securities fraud); 18 U. S. C. §1343 (2000 ed.) (wire fraud); 15 U. S. C. §78j(b) (1994 ed.), §78ff (2000 ed.), and 17 CFR §240.10b–5–1 (insider trading); 18 U. S. C. §1957 (money laundering).

[2] While petitioner was charged with 126 counts, the indictment in-

Count 1 of the indictment described in some detail the alleged conspiracy to commit securities fraud and wire fraud and included as overt acts the substantive offenses charged in counts 2 through 6. Count 2, the securities fraud count, alleged that petitioner made false and misleading statements at the January 20, 2000, analyst conference or that he failed to state facts necessary to prevent statements made by others from being misleading. Counts 3 through 6 alleged that petitioner and others committed four acts of wire fraud when they issued four EBS-related press releases in 2000. Counts 27 through 46, the insider trading counts, alleged that petitioner made 20 separate sales of Enron stock "while in the possession of material non-public information regarding the technological capabilities, value, revenue and business performance of [EBS]." *Id.,* at 31. And counts 67 through 165, the money laundering counts, described 99 financial transactions involving petitioner's use of the proceeds of his sales of Enron stock, which the indictment characterized as "criminally derived property." *Id.,* at 37. To simplify our discussion, we shall refer to counts 1 through 6 as the "fraud counts" and the remaining counts as the "insider trading counts."

The trial lasted 13 weeks. After four days of deliberations, the jury notified the court that it had reached agreement on some counts but had deadlocked on others. The judge then gave the jury an *Allen* charge, see *Allen* v. *United States,* 164 U. S. 492, 501–502 (1896), urging the jurors to reexamine the grounds for their opinions and to continue deliberations "until the end of the day" to achieve a final verdict on all counts. Tr. 13724 (July 20, 2005). When the jury failed to break the deadlock, the court told the jurors that it would "take their verdict" instead of

---

cluded 176 counts in all, covering conduct by executives purportedly involved in the alleged fraud.

prolonging deliberations. *Id.*, at 13725. The jury acquitted petitioner on the fraud counts but failed to reach a verdict on the insider trading counts. The court entered judgment on the acquittals and declared a mistrial on the hung counts.

On November 9, 2005, the Government obtained a new indictment against petitioner. This "Eighth Superseding Indictment" recharged petitioner with some, but not all, of the insider trading counts on which the jury had previously hung. App. 188. The new indictment refined the Government's case: Whereas the earlier indictment had named multiple defendants, the new indictment dealt exclusively with petitioner. And instead of alleging facts implicating a broader fraudulent scheme, the new indictment focused on petitioner's knowledge of the EIN project and his failure to disclose that information to the public before selling his Enron stock.

Petitioner moved to dismiss all counts in the new indictment on the ground that the acquittals on the fraud counts precluded the Government from retrying him on the insider trading counts.[3] He argued that the jury's acquittals had necessarily decided that he did not possess material, nonpublic information about the performance of the EIN project and its value to Enron. In petitioner's view, because reprosecution for insider trading would require the Government to prove that critical fact, the issue-preclusion component of the Double Jeopardy Clause barred a second trial of that issue and mandated dismissal of all of the insider trading counts.

The District Court denied the motion. After reviewing the trial record, the court disagreed with petitioner's

---

[3] Petitioner had also moved to dismiss the relevant counts in the earlier indictment in response to the Government's assertion that it could reprosecute petitioner for the previously hung counts under that indictment as well. See 521 F. 3d 367, 370, n. 4 (CA5 2008).

reading of what the jury necessarily decided. In the court's telling, the jury likely concluded that petitioner "did not knowingly and willfully participate in the scheme to defraud described in the conspiracy, securities fraud, and wire fraud counts." 446 F. Supp. 2d 719, 735 (SD Tex. 2006). The court therefore concluded that the question whether petitioner possessed insider information was not necessarily resolved in the first trial and could be litigated anew in a second prosecution.

The Court of Appeals disagreed with the District Court's analysis of the record, but nevertheless affirmed. It reasoned that petitioner "did not dispute" the Government's theory that he "helped shape the message" of the allegedly fraudulent presentations made at the analyst conference, and therefore rejected the District Court's conclusion that the jury had "acquitted [petitioner] on the groun[d] that he did not participate in the fraud." 521 F. 3d 367, 377 (CA5 2008). Based on its independent review of the record, the Court of Appeals instead concluded that "the jury must have found when it acquitted [petitioner] that [he] did not have any insider information that contradicted what was presented to the public." *Id.*, at 378. The court acknowledged that this factual determination would normally preclude the Government from retrying petitioner for insider trading or money laundering.

The court was nevertheless persuaded that a truly rational jury, having concluded that petitioner did not have any insider information, would have *acquitted* him on the insider trading counts. That the jury failed to acquit, and instead hung on those counts, was pivotal in the court's issue-preclusion analysis. Considering "the hung counts along with the acquittals," the court found it impossible "to decide with any certainty what the jury necessarily determined." *Ibid.* Relying on Circuit precedent, *United States* v. *Larkin*, 605 F. 2d 1360 (1979), the court concluded that the conflict between the acquittals

and the hung counts barred the application of issue preclusion in this case. 521 F. 3d, at 378–379.

Several courts have taken the contrary view and have held that a jury's failure to reach a verdict on some counts should play no role in determining the preclusive effect of an acquittal. See *United States* v. *Ohayon*, 483 F. 3d 1281 (CA11 2007); *United States* v. *Romeo*, 114 F. 3d 141 (CA9 1997); *United States* v. *Bailin*, 977 F. 2d 270 (CA7 1992); *United States* v. *Frazier*, 880 F. 2d 878 (CA6 1989). Others have sided with the Court of Appeals. See *United States* v. *Howe*, 538 F. 3d 820 (CA8 2008); *United States* v. *Aguilar-Aranceta*, 957 F. 2d 18 (CA1 1992); *United States* v. *White*, 936 F. 2d 1326 (CADC 1991). We granted certiorari to resolve the conflict, 555 U. S. ___ (2008), and now reverse.

## II

The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb."

While we have decided an exceptionally large number of cases interpreting this provision, see, *e.g.*, *United States* v. *DiFrancesco*, 449 U. S. 117, 126–127 (1980) (collecting cases), most of our decisions have found more guidance in the common-law ancestry of the Clause than in its brief text. Thus, for example, while the risk of being fined or imprisoned implicates neither "life" nor "limb," our early cases held that double jeopardy protection extends to punishments that are not "*positively* covered by the *language* of [the] amendment." *Ex parte Lange*, 18 Wall. 163, 170 (1874). As we explained, "[i]t is very clearly the *spirit* of the instrument to prevent a second punishment under judicial proceedings for the same crime, so far as the common law gave that protection." *Ibid*.

Our cases have recognized that the Clause embodies two vitally important interests. The first is the "deeply in-

grained" principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green* v. *United States*, 355 U. S. 184, 187–188 (1957); see *Benton* v. *Maryland*, 395 U. S. 784, 795–795 (1969); *DiFrancesco*, 449 U. S., at 127–128. The second interest is the preservation of "the finality of judgments." *Crist* v. *Bretz*, 437 U. S. 28, 33 (1978).

The first interest is implicated whenever the State seeks a second trial after its first attempt to obtain a conviction results in a mistrial because the jury has failed to reach a verdict. In these circumstances, however, while the defendant has an interest in avoiding multiple trials, the Clause does not prevent the Government from seeking to reprosecute. Despite the argument's textual appeal, we have held that the second trial does not place the defendant in jeopardy "twice." *Richardson* v. *United States*, 468 U. S. 317, 323 (1984); see 3 J. Story, Commentaries on the Constitution §1781, pp. 659–660 (1833). Instead, a jury's inability to reach a decision is the kind of "manifest necessity" that permits the declaration of a mistrial and the continuation of the initial jeopardy that commenced when the jury was first impaneled. See *Arizona* v. *Washington*, 434 U. S. 497, 505–506 (1978); *United States* v. *Perez*, 9 Wheat. 579, 580 (1824). The "interest in giving the prosecution one complete opportunity to convict those who have violated its laws" justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial. *Washington*, 434 U. S., at 509.

While the case before us involves a mistrial on the insider trading counts, the question presented cannot be resolved by asking whether the Government should be

given one complete opportunity to convict petitioner on those charges. Rather, the case turns on the second interest at the core of the Clause. We must determine whether the interest in preserving the finality of the jury's judgment on the fraud counts, including the jury's finding that petitioner did not possess insider information, bars a retrial on the insider trading counts. This requires us to look beyond the Clause's prohibition on being put in jeopardy "twice"; the jury's acquittals unquestionably terminated petitioner's jeopardy with respect to the issues finally decided in those counts. The proper question, under the Clause's text, is whether it is appropriate to treat the insider trading charges as the "same offence" as the fraud charges. Our opinion in *Ashe* v. *Swenson*, 397 U. S. 436 (1970), provides the basis for our answer.

In *Ashe,* we squarely held that the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial. In that case, six poker players were robbed by a group of masked men. Ashe was charged with—and acquitted of—robbing Donald Knight, one of the six players. The State sought to retry Ashe for the robbery of another poker player only weeks after the first jury had acquitted him. The second prosecution was successful: Facing "substantially stronger" testimony from "witnesses [who] were for the most part the same," *id.*, at 439–440, Ashe was convicted and sentenced to a 35-year prison term. We concluded that the subsequent prosecution was constitutionally prohibited. Because the only contested issue at the first trial was whether Ashe was one of the robbers, we held that the jury's verdict of acquittal collaterally estopped the State from trying him for robbing a different player during the same criminal episode. *Id.*, at 446. We explained that "when an issue of ultimate fact has once been determined by a valid and final judgment" of acquittal, it "cannot again be litigated" in a second trial

for a separate offense. *Id.*, at 443.[4] To decipher what a jury has necessarily decided, we held that courts should "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.*, at 444 (internal quotation marks omitted). We explained that the inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Ibid.* (quoting *Sealfon* v. *United States*, 332 U. S. 575, 579 (1948) (internal quotation marks omitted)).

Unlike *Ashe*, the case before us today entails a trial that included multiple counts rather than a trial for a single offense. And, while *Ashe* involved an acquittal for that single offense, this case involves an acquittal on some counts and a mistrial declared on others. The reasoning in *Ashe* is nevertheless controlling because, for double jeopardy purposes, the jury's inability to reach a verdict on the insider trading counts was a nonevent and the acquittals on the fraud counts are entitled to the same effect as Ashe's acquittal.

As noted above, see *supra*, at 4, the Court of Appeals reasoned that the hung counts must be considered to determine what issues the jury decided in the first trial. Viewed in isolation, the court explained, the acquittals on

---

[4] Although the doctrine of collateral estoppel had developed in civil litigation, we had already extended it to criminal proceedings when *Ashe* was decided. The justification for this application was first offered by Justice Holmes, who observed that "[i]t cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt." *United States* v. *Oppenheimer*, 242 U. S. 85, 87 (1916). Currently, the more descriptive term "issue preclusion" is often used in lieu of "collateral estoppel." See Restatement (Second) of Judgments §27 (1980).

the fraud charges would preclude retrial because they appeared to support petitioner's argument that the jury decided he lacked insider information. 521 F. 3d, at 378. Viewed alongside the hung counts, however, the acquittals appeared less decisive. The problem, as the court saw it, was that, if "the jury found that [petitioner] did not have insider information, then the jury, acting rationally, would also have acquitted [him] of the insider trading counts." *Ibid.* The fact that the jury hung was a logical wrinkle that made it impossible for the court "to decide with any certainty what the jury necessarily determined." *Ibid.* Because petitioner failed to show what the jury decided, *id.,* at 380, the court refused to find the Government precluded from pursuing the hung counts in a new prosecution.

The Court of Appeals' issue-preclusion analysis was in error. A hung count is not a "relevant" part of the "record of [the] prior proceeding." See *Ashe,* 397 U. S., at 444 (internal quotation marks omitted). Because a jury speaks only through its verdict, its failure to reach a verdict cannot—by negative implication—yield a piece of information that helps put together the trial puzzle. A mistried count is therefore nothing like the other forms of record material that *Ashe* suggested should be part of the preclusion inquiry. *Ibid.;* see also Black's Law Dictionary 1301 (8th ed. 2004) (defining "record" as the "official report of the proceedings in a case, including the filed papers, verbatim transcript of the trial or hearing (if any), and tangible exhibits"). Unlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung count represents. Even in the usual sense of "relevance," a hung count hardly "make[s] the existence of any fact . . . more probable or less probable." Fed. Rule Evid. 401. A host of reasons—sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few—could work alone or in tandem to

cause a jury to hang.[5]  To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room.  But that is not reasoned analysis; it is guesswork.[6]  Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return.

A contrary conclusion would require speculation into what transpired in the jury room.  Courts properly avoid such explorations into the jury's sovereign space, see *United States* v. *Powell*, 469 U. S. 57, 66 (1984); Fed. Rule Evid. 606(b), and for good reason.  The jury's deliberations are secret and not subject to outside examination.  If there is to be an inquiry into what the jury decided, the "evidence should be confined to the points in controversy on the former trial, to the testimony given by the parties, and to the questions submitted to the jury for their consideration."  *Packet Co.* v. *Sickles*, 5 Wall. 580, 593 (1866); see also *Vaise* v. *Delaval*, 99 Eng. Rep. 944 (K. B. 1785) (Lord Mansfield, C. J.) (refusing to rely on juror affidavits to impeach a verdict reached by a coin flip); J. Wigmore, Evidence §2349, pp. 681–690, and n. 2 (McNaughton rev. ed. 1961 and Supp. 1991).

Accordingly, we hold that the consideration of hung counts has no place in the issue-preclusion analysis.

_____

[5] Indeed, there were many indications that the jury in this case could have been exhausted after the 13-week trial.  See Reply Brief for Petitioner 9–10 (cataloging numerous "statements on the record [that] reveal the very real possibility that the jurors cut their deliberations short out of exhaustion").

[6] It would also require too much of the defendant.  To preclude retrial, he must show that the jury necessarily decided an issue in his favor.  Yet, to borrow from the Court of Appeals, "[b]ecause it is impossible to determine why [a] jury hung," 521 F. 3d, at 379, the defendant will have to rebut all inferences about what *may have* motivated the jury to hang without the ability to seek conclusive proof.  See Fed. Rule Evid. 606(b).  There is no reason to impose such a burden on a defendant.

Indeed, if it were relevant, the fact that petitioner has already survived one trial should be a factor cutting in favor of, rather than against, applying a double jeopardy bar. To identify what a jury necessarily determined at trial, courts should scrutinize a jury's decisions, not its failures to decide. A jury's verdict of acquittal represents the community's collective judgment regarding all the evidence and arguments presented to it. Even if the verdict is "based upon an egregiously erroneous foundation," *Fong Foo* v. *United States*, 369 U. S. 141, 143 (1962) *(per curiam)*, its finality is unassailable. See, *e.g.*, *Washington*, 434 U. S., at 503; *Sanabria* v. *United States*, 437 U. S. 54, 64 (1978). Thus, if the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element.

### III

The Government relies heavily on two of our cases, *Richardson* v. *United States*, 468 U. S. 317, and *United States* v. *Powell*, 469 U. S. 57, to argue that it is entitled to retry petitioner on the insider trading counts. Neither precedent can bear the weight the Government places on it.

In *Richardson*, the defendant was indicted on three counts of narcotics violations. The jury acquitted him on one count but hung on the others. Richardson moved to bar retrial on the hung counts, insisting that reprosecution would place him twice in jeopardy for the same offense. Unlike petitioner in this case, Richardson did not argue that retrial was barred because the jury's verdict of acquittal meant that it necessarily decided an essential fact in his favor. He simply asserted that the hung counts, standing alone, shielded him from reprosecution. We disagreed and held that "the protection of the Double

Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." 468 U. S., at 325. "[T]he failure of the jury to reach a verdict," we explained, "is not an event which terminates jeopardy." *Ibid.* From this the Government extrapolates the altogether different principle that retrial is *always* permitted whenever a jury convicts on some counts and hangs on others. Brief for United States 23–24. But *Richardson* was not so broad. Rather, our conclusion was a rejection of the argument—similar to the one the Government urges today—that a mistrial is an event of significance. In so holding, we did not open the door to using a mistried count to ignore the preclusive effect of a jury's acquittal.

The Government next contends that an acquittal can never preclude retrial on a mistried count because it would impute irrationality to the jury in violation of the rule articulated in *Powell*, 469 U. S. 57. In *Powell*, the defendant was charged with various drug offenses. The jury acquitted Powell of the substantive drug charges but convicted her of using a telephone in "'committing and in causing and facilitating'" those same offenses. *Id.*, at 59–60. Powell attacked the verdicts on appeal as irrationally inconsistent and urged the reversal of her convictions. She insisted that "collateral estoppel should apply to verdicts rendered by a single jury, to preclude acceptance of a guilty verdict on a telephone facilitation count where the jury acquits the defendant of the predicate felony." *Id.*, at 64. We rejected this argument, reasoning that issue preclusion is "predicated on the assumption that the jury acted rationally." *Id.*, at 68.

Arguing that a jury that acquits on some counts while inexplicably hanging on others is not rational, the Government contends that issue preclusion is as inappropriate in this case as it was in *Powell*. There are two serious flaws in this line of reasoning. First, it takes *Powell*'s

treatment of inconsistent *verdicts* and imports it into an entirely different context involving both *verdicts* and seemingly inconsistent *hung counts*. But the situations are quite dissimilar. In *Powell*, respect for the jury's verdicts counseled giving each verdict full effect, however inconsistent. As we explained, the jury's verdict "brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality." *Id.*, at 67. By comparison, hung counts have never been accorded respect as a matter of law or history, and are not similar to jury verdicts in any relevant sense. By equating them, the Government's argument fails. Second, the Government's reliance on *Powell* assumes that a mistried count can, in context, be evidence of irrationality. But, as we explained above, see *supra*, at 7–8, the fact that a jury hangs is evidence of nothing—other than, of course, that it has failed to decide anything. By relying on hung counts to question the basis of the jury's verdicts, the Government violates the very assumption of rationality it invokes for support.

At bottom, the Government misreads our cases that have rejected attempts to question the validity of a jury's verdict. In *Powell* and, before that, in *Dunn,* 284 U. S. 390, we were faced with jury verdicts that, on their face, were logically inconsistent and yet we refused to impugn the legitimacy of either verdict. In this case, there is merely a *suggestion* that the jury may have acted irrationally. And instead of resting that suggestion on a verdict, the Government relies on a hung count, the thinnest reed of all. If the Court in *Powell* and *Dunn* declined to use a clearly inconsistent verdict to second-guess the soundness of another verdict, then, *a fortiori*, a potentially inconsistent hung count could not command a different result.

## IV

One final matter requires discussion. The Government

argues that even if we conclude (as we do) that acquittals can preclude retrial on counts on which the same jury hangs, we should nevertheless affirm the judgment of the Court of Appeals because petitioner failed to show that the jury necessarily resolved in his favor an issue of ultimate fact that the Government must prove in order to convict him of insider trading and money laundering. See Brief for United States 41–45. Given the length and complexity of the proceedings, this factual dispute is understandable. The District Court and Court of Appeals each read the record differently, disagreeing as to what the jury necessarily decided in its acquittals. Compare 446 F. Supp. 2d, at 735 ("[T]he jury necessarily determined that Defendant Yeager did not knowingly and willfully participate or agree to participate in a scheme to defraud in connection with the alleged false statements or material omissions made at the analyst conference and press releases"), with 521 F. 3d, at 378 ("[T]he jury must have found when it acquitted Yeager that Yeager himself did not have any insider information that contradicted what was presented to the public"). Our grant of certiorari was based on the assumption that the Court of Appeals' interpretation of the record was correct. We recognize the Government's right, as the prevailing party in the Court of Appeals, to "defend its judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court or the Court of Appeals." *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 476, n. 20 (1979). But we decline to engage in a fact-intensive analysis of the voluminous record, an undertaking unnecessary to the resolution of the narrow legal question we granted certiorari to answer. If it chooses, the Court of Appeals may revisit its factual analysis in light of the Government's arguments before this Court.

## V

The judgment is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–67

_____

## F. SCOTT YEAGER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2009]

JUSTICE KENNEDY, concurring in part and concurring in the judgment.

I join Parts I–III and V of the Court's opinion but cannot join Part IV. In my view the concerns expressed by JUSTICE ALITO are well justified. *Post*, ___ (dissenting opinion). It is insufficient for the Court to say that, on remand, the Court of Appeals "may," "[i]f it chooses," "revisit its factual analysis." *Ante*, at 15. The correct course would be to require the Court of Appeals to do so.

As JUSTICE ALITO explains, the judgments of acquittal preclude the Government from retrying petitioner on the issue of his possession of insider information if, and only if, "it would have been *irrational* for the jury to acquit without finding that fact." *Post*, at 1; see *Ashe* v. *Swenson*, 397 U. S. 436, 444 (1970) (retrial not precluded if "a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose").

For the reasons given by JUSTICE ALITO, there are grounds here to question whether petitioner has met this demanding standard. *Post*, at 2. The District Court, which was the court most familiar with the record, found that petitioner could not make this showing because a rational jury could have acquitted him of securities fraud on a different basis—namely, that petitioner did not cause the misleading statements to be made. *Post*, at 3–4. The

Court of Appeals' contrary analysis is not convincing. *Post*, at 4.

The Court of Appeals held the Double Jeopardy Clause permits petitioner's retrial because, in that court's view, the acquitted counts were inconsistent with the jury's inability to reach a verdict on other counts. 521 F. 3d 367, 379 (CA5 2008). The Court today corrects that misreading of the Double Jeopardy Clause. The question remains whether the Clause permits petitioner's retrial for the quite distinct reason JUSTICE ALITO describes. On remand, the Court of Appeals should reexamine this question.

# SUPREME COURT OF THE UNITED STATES

—————

No. 08–67

—————

## F. SCOTT YEAGER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2009]

JUSTICE SCALIA, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Court today holds that this proscription, as interpreted in *Ashe* v. *Swenson*, 397 U. S. 436 (1970), sometimes bars retrial of hung counts if the jury acquits on factually related counts. Because that result neither accords with the original meaning of the Double Jeopardy Clause nor is required by the Court's precedents, I dissent.

I

Today's opinion begins with the proclamation that this Court has "found more guidance in the common-law ancestry of the [Double Jeopardy] Clause than its brief text." *Ante*, at 6. Would that it were so. This case would be easy indeed if our cases had adhered to the Clause's original meaning. The English common-law pleas of *auterfoits acquit* and *auterfoits convict*, on which the Clause was based, barred only repeated "prosecution for the same identical act *and* crime." 4 W. Blackstone, Commentaries on the Laws of England 330 (1769) (emphasis added). See also *Grady* v. *Corbin*, 495 U. S. 508, 530–535 (1990) (SCALIA, J., dissenting). As described by Sir Matthew Hale, "a man acquitted for stealing [a] horse" could be

later "arraigned and convict[ed] for stealing the saddle, tho both were done at the same time." 2 Pleas of the Crown 246 (1736). Under the common-law pleas, the jury's acquittal of Yeager on the fraud counts would have posed no bar to further prosecution for the distinct crimes of insider trading and money laundering.

But that is water over the dam. In *Ashe* the Court departed from the original meaning of the Double Jeopardy Clause, holding that it precludes successive prosecutions on distinct crimes when facts essential to conviction of the second crime have necessarily been resolved in the defendant's favor by a verdict of acquittal of the first crime. 397 U. S., at 445–446.[1] Even if I am to adhere to *Ashe* on *stare decisis* grounds, cf. *Grady*, *supra,* at 528 (SCALIA, J., dissenting), today's holding is an illogical extension of that case. *Ashe* held only that the Clause sometimes bars successive prosecution of facts found during "a prior proceeding." 397 U. S., at 444. But today the Court bars retrial on hung counts after what was not, under this Court's theory of "continuing jeopardy," *Justices of Boston Municipal Court* v. *Lydon*, 466 U. S. 294, 308 (1984), a prior proceeding but simply an earlier stage of the same proceeding.

As an historical matter, the common-law pleas could be invoked only once "there ha[d] been a conviction or an acquittal—after a complete trial." *Crist* v. *Bretz*, 437 U. S.

––––––

[1] Because this case arises in federal court, the federal doctrine of issue preclusion might have prevented the Government from retrying Yeager even without *Ashe*'s innovation. See *United States* v. *Oppenheimer*, 242 U. S. 85, 87 (1916). But the District Court held that the jury in this case had not necessarily decided that Yeager lacked inside information (the fact that Yeager claims the Government is barred from relitigating), 446 F. Supp. 2d 719, 735 (SD Tex. 2006), and jurisdiction for this interlocutory appeal of that holding comes by way of the collateral order doctrine, which encompasses claims of former jeopardy, *Abney* v. *United States*, 431 U. S. 651, 662 (1977). We have not accorded the same privilege to litigants asserting issue preclusion.

28, 33 (1978). This Court has extended the protections of the Double Jeopardy Clause by holding that jeopardy attaches earlier: at the time a jury is empanelled and sworn. *Id.,* at 38. Although one might think that this early attachment would mean that any second trial with a new jury would constitute a second jeopardy, the Court amended its innovation by holding that discharge of a deadlocked jury does not "terminat[e] the original jeopardy," *Richardson* v. *United States*, 468 U. S. 317, 325 (1984). Under this continuing-jeopardy principle, retrial after a jury has failed to reach a verdict is not a new trial but part of the same proceeding.[2]

Today's holding is inconsistent with this principle. It interprets the Double Jeopardy Clause, for the first time, to have effect internally within a single prosecution, even though the "'criminal proceedings against [the] accused have not run their full course.'" *Lydon, supra,* at 308 (quoting *Price* v. *Georgia*, 398 U. S. 323, 326 (1970)). As a conceptual matter, it makes no sense to say that events occurring within a single prosecution can cause an accused to be "twice put in jeopardy." U. S. Const., Amdt. 5. And our cases, until today, have acknowledged that. Ever since *Dunn* v. *United States*, 284 U. S. 390, 393 (1932), we have refused to set aside convictions that were inconsistent with acquittals in the same trial; and we made clear

_____

[2] That the Government issued a new indictment after the mistrial in this case does not alter the fact that, for double jeopardy purposes, retrial would have been part of the same, initial proceeding. As a matter of practice, it seems that prosecutors and courts treat retrials after mistrials as part of the same proceeding by filing superseding indictments under the original docket number. See, *e.g.*, Superseding Information in *United States* v. *Pena*, Case No. 8:03–cr–476–T–23EAJ (MD Fla., Feb. 17, 2005). The Court implies that the new indictment in this case materially refined the charges, *ante*, at 4, but the only relevant changes were dropping of the other defendants and elimination of a few counts and related factual allegations. Compare App. 6–71 with App. 188–200.

in *United States* v. *Powell*, 469 U. S. 57, 64–65 (1984), that *Ashe* does not mandate a different result. There is no reason to treat perceived inconsistencies between hung counts and acquittals any differently.

*Richardson* accentuates the point. Under our cases, if an appellate court reverses a conviction for lack of constitutionally sufficient evidence, that determination constitutes an acquittal which, under the Double Jeopardy Clause, precludes further prosecution. *Burks* v. *United States*, 437 U. S. 1, 11 (1978). In *Richardson*, the defendant sought to prevent retrial after a jury failed to reach a verdict, claiming that the case should not have gone to the jury because the Government failed to present sufficient evidence. 468 U. S., at 322–323. The Court held that the Double Jeopardy Clause was inapplicable because there had not been an "event, such as an acquittal, which terminate[d] the original jeopardy." *Id.,* at 325. I do not see why the Double Jeopardy Clause effect of a jury acquittal on a different count should be any different from the Double Jeopardy Clause effect of the prosecution's failure to present a case sufficient to go to the jury on the same count. In both cases, the predicate necessary for Double Jeopardy Clause preclusion of a new prosecution exists: in the former, the factual findings implicit in the jury's verdict of acquittal, in the latter, the State's presentation of a case so weak that it would have demanded a jury verdict of acquittal. In both cases, it seems to me, the Double Jeopardy Clause cannot be invoked because the jeopardy with respect to the retried count *has not terminated*.

The acquittals here did not, as the majority argues, "unquestionably terminat[e] [Yeager's] jeopardy with respect to the *issues* finally decided" in those counts. *Ante*, at 8 (emphasis added). Jeopardy is commenced and terminated charge by charge, not issue by issue. And if the prosecution's failure to present sufficient evidence at a first trial cannot prevent retrial on a hung count because

the retrial is considered part of the same proceeding, then there is no basis for invoking *Ashe* to prevent retrial in the present case. If a conviction can stand with a contradictory acquittal when both are pronounced at the same trial, there is no reason why an acquittal should prevent the State from pressing for a contradictory conviction in the continuation of the prosecution on the hung counts.

## II

The Court's extension of *Ashe* to these circumstances cannot even be justified based on the rationales underlying that holding. Invoking issue preclusion to bar *seriatim* prosecutions has the salutary effect of preventing the Government from circumventing acquittals by forcing defendants "to 'run the gantlet' a second time" on effectively the same charges. 397 U. S., at 446. In cases where the prosecution merely seeks to get "one full and fair opportunity to convict" on all charges brought in an initial indictment, *Ohio* v. *Johnson*, 467 U. S. 493, 502 (1984), there is no risk of such gamesmanship. We have said that "where the State has made no effort to prosecute the charges seriatim, the considerations of double jeopardy protection implicit in the application of collateral estoppel are inapplicable." *Id.,* at 500, n. 9.

Moreover, barring retrial when a jury acquits on some counts and hangs on others bears only a tenuous relationship to preserving the finality of "an issue of ultimate fact [actually] determined by a valid and final judgment." *Ashe, supra,* at 443. There is no clear, unanimous jury finding here. In the unusual situation in which a factual finding upon which an acquittal must have been based would also logically require an acquittal on the hung count, all that can be said for certain is that the conflicting dispositions are irrational—the result of "mistake, compromise, or lenity." *Powell,* 469 U. S., at 65. It is at least as likely that the irrationality consisted of failing to make

the factual finding necessary to support the acquittal as it is that the irrationality consisted of failing to adhere to that factual finding with respect to the hung count. While I agree that courts should avoid speculation as to why a jury reached a particular result, *ante,* at 11, the Court's opinion steps in the wrong direction by pretending that the acquittals here mean something that they in all probability do not.[3] *Powell, supra,* at 69, concluded that "the best course to take is simply to insulate jury verdicts" from review on grounds of inconsistency. In my view the same conclusion applies to claims that inconsistency will arise from proceeding to conviction on hung counts.

The burdens created by the Court's opinion today are likely to be substantial. The *Ashe* inquiry will require courts to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." 397 U. S., at 446 (internal quotation marks omitted). What is more, our holding in *Abney* v. *United States*, 431 U. S. 651 (1977), ensures that every defendant in Yeager's shoes will be entitled to an immediate interlocutory appeal (and petition for certiorari) whenever his *Ashe* claim is rejected by the trial court. *Abney, supra,* at 662.

\* \* \*

Until today, this Court has consistently held that retrial after a jury has been unable to reach a verdict is part of the original prosecution and that there can be no second

---

[3] The Court claims that a jury's failure to reach a verdict is not relevant evidence, *ante,* at 10, but its justifications for that statement are utterly unpersuasive. It is obvious that a failure to reach a verdict on one count "make[s] the existence" of a factual finding on a necessary predicate for both counts substantially "less probable," Fed. Rule Evid. 401; how the Court can believe otherwise is beyond me.

jeopardy where there has been no second prosecution. Because I believe holding that line against this extension of *Ashe* is more consistent with the Court's cases and with the original meaning of the Double Jeopardy Clause, I would affirm the judgment.

# SUPREME COURT OF THE UNITED STATES

───────────

No. 08–67

───────────

## F. SCOTT YEAGER, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2009]

JUSTICE ALITO, with whom JUSTICE SCALIA and JUSTICE
THOMAS join, dissenting.

I join JUSTICE SCALIA's dissenting opinion. When a jury
acquits on some counts but cannot reach agreement on
others, I do not think that the Double Jeopardy Clause
precludes retrial on the "hung" counts.

As a result of today's decision, however, the law is now
to the contrary, and I write separately to note that the
Court's holding makes it imperative that the doctrine of
issue preclusion be applied with the rigor prescribed in
*Ashe* v. *Swenson*, 397 U. S. 436 (1970). Loose application
of the doctrine will lead to exceedingly complicated and
protracted litigation, both in the trial court and on appeal,
and may produce unjust results.

*Ashe* made it clear that an acquittal on one charge
precludes a subsequent trial on a different charge only if
"a rational jury" could not have acquitted on the first
charge without finding in the defendant's favor on a fac-
tual issue that the prosecution would have to prove in
order to convict in the later trial. *Id.*, at 444. This is a
demanding standard. The second trial is not precluded
simply because it is unlikely—or even very unlikely—that
the original jury acquitted without finding the fact in
question. Only if it would have been *irrational* for the jury
to acquit without finding that fact is the subsequent trial
barred. And the defendant has the burden of showing that

"the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Dowling* v. *United States*, 493 U. S. 342, 350 (1990).

The situation presented in a case like the one now before us—where the jury acquits on some counts but cannot reach a verdict on others—calls for special care in the application of the *Ashe* standard. In such a situation, the conclusion that the not-guilty verdicts preclude retrial on the hung counts necessarily means that the jury did not act rationally. But courts should begin with the presumption that a jury's actions can rationally be reconciled. In an analogous situation—where it is claimed that a verdict must be set aside on the ground that the findings set out in a jury's answers to special interrogatories are inconsistent—"it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.'" *Gallick* v. *Baltimore & Ohio R. Co.*, 372 U. S. 108, 119 (1963) (quoting *Atlantic & Gulf Stevedores, Inc.* v. *Ellerman Lines, Ltd.*, 369 U. S. 355, 364 (1962)). A similar approach is appropriate here.

In the present case, there is reason to question whether the *Ashe* standard was met. It is clear that the fraud counts required proof of an element not necessary for conviction on the insider trading charge, namely, that petitioner "caused" material misstatements or omissions to be made at the January 20, 2000, analyst conference and in the press releases that formed the basis for the wire fraud counts. See App. 107 (jury instruction on count two (securities fraud)), 118 (jury instruction on counts three through six (wire fraud)). And it is far from apparent that the jury's not-guilty verdict on the fraud counts could not have rationally been based on a determination that this element—that petitioner caused the material misstatements or omissions—was not proved beyond a

reasonable doubt.

The District Court Judge, who was of course familiar with the trial evidence, analyzed this issue as follows:

> "The theory of the defense, evident in closing argument and the direct testimony of Defendant Yeager, argued that Defendant Yeager did not participate in the crafting of the statements in the press releases; did not participate in the creation of slides or statements presented at the analysts conference; and did not reach an agreement with any other person to make false, misleading, or deceptive statements or material omissions of fact." App. to Pet. for Cert. 55a.

The record provides support for the District Court's analysis. In his summation, petitioner's attorney argued that "Scott Yeager had nothing to do with Counts 3 to 6 [the securities and wire fraud counts]." 80 Tr. 13384. With respect to the January 20, 2000, conference that provided the basis for the securities fraud count, petitioner's attorney emphasized that his client "didn't say anything." *Id.*, at 13365. Counsel reiterated that petitioner "didn't make a presentation. He didn't make a statement." *Ibid.; id.*, at 13394. Counsel's summation on this point summarized portions of petitioner's trial testimony in which he minimized his involvement in matters relating to the conference. See 52 *id.,* at 9932–9933, 9938–9947, and 9953.

With respect to the press releases on which the wire fraud counts were based, petitioner's attorney argued: "Scott Yeager had nothing to do with the press releases." 80 *id.*, at 13384. "We didn't make any press releases." *Id.*, at 13394. "Show me the evidence. Show me where Scott participated in a press release." *Id.*, at 13406. Again, counsel's comments in summation tracked petitioner's testimony denying participation in the press releases. See 52 *id.,* at 9911, 9913; 80 *id.,* at 13384.

The above portions of the record suggest that a rational jury might have found that petitioner did not "cause" the misstatements or omissions at the conference or in the press releases. In light of the length and complexity of the trial record, I am not in a position to say with certainty that the *Ashe* standard was not met in this case, but the brief discussion of this question in the opinion of the Court of Appeals does not satisfactorily show that the District Court's analysis was incorrect. Concluding that the not-guilty verdict on the securities fraud count could not have been based on a finding that respondent did not cause the misstatements or omissions at the conference, the Court of Appeals stated that petitioner "did not dispute" that he "helped shape the message of the conference presentations." App. to Pet. for Cert. 20a. But there is surely tension between that statement and the previously mentioned portions of petitioner's trial testimony and the defense summation.

Because the Court of Appeals held that *Ashe* does not apply when a jury acquits on some counts and hangs on others, that court's analysis of the possible grounds for the jury's securities fraud verdict was not necessary to support the court's decision. Now that this Court has held that *Ashe* does govern in this context, a reexamination of the possible grounds for the fraud count acquittals is warranted.